without his knowledge or consent, and are a fraud on his rights.

While admitting in his testimony that the document he signed, at the time the money was paid to him, was read to him, he claims he did not understand from the reading that he was renouncing whatever right he had to sue for damages.

Yet he confesses he went to Nelson and asked him if he was going to help him any.

On being recalled he testified, over objection, that it was not his intention, in accepting the money, to surrender his right to sue the company for injuries received while in its service, and that while the receipt was read to him, it was not explained, and he did not understand it.

On the other hand Mr. Nelson testifies he both read and explained the receipt to Kelly, telling him what it was, and paid him the money.

Ferguson, the President of the Company, testifies he gave Nelson the money to pay Kelly and the receipt for him to sign, and that this was done after Kelly had been to him a half dozen times asking for money. He says he told Kelly the company owed him nothing except his wages, but was willing to give him something beyond the sum due for wages, and the amount of $25.00 was finally agreed on between them; that $25.00 was the amount he (Kelly), himself, said he ought to have.

It thus appears that Kelly, some weeks after he was hurt, deliberately sought compensation from the officials of the company, and after repeated visits and requests for money accepted $25.00 and signed a receipt which was read to him, and according to Nelson, whose testimony we fully believe, explained to him.

This was in settlement of whatever claim he had against the company.

It was writing and as an agreement of compromise, for preventing a lawsuit and adjusting differences by mutual consent, meets the requirements of Civ. Code, art. 3071.

Thereafter Kelly was without legal right to sue, and, having sued, the settlement referred to, made under the circumstances as detailed, could well be pleaded in bar of the action.

This case is easily differentiated, in the facts constituting the compromise settlement, from the case of Lampkin v. Railroad Co., 42 La. Ann. 1000, 8 South. 530.

Judgment affirmed.

---

(35 South. 257.)

No. 14,284.

Succession of LABAT.

(Nov. 3, 1903.)

DEATH OF WIFE—SURVIVING HUSBAND—AGENCY.

1. In the absence of conclusive evidence to· the contrary, it will be presumed that a surviving husband, who, without legal authority, and without taking the steps required by law to protect the interests of her minor children, takes· possession of the estate of his deceased wife, and conducts a business belonging thereto, and thereafter opens an account in bank as "agent," means thereby that he is acting as the agent of the owners of such estate and business.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of· Orleans; Walter Byers Sommerville, Judge.

In the matter of the succession of Maria Labat, widow by first marriage of Victor Lamia, and wife by second marriage of· Christian Redenbach. Petition by the heirs of Christian Redenbach, annulling the inventory, and decreeing them to be the owners of certain· moneys. From an order denying the same, the petitioners appeal. Modified.

J. Valsin Guillotte and Lloyd Posey, for· appellants. Wynne Grey Rogers, Arthur· Landry, and Anthony Joseph Rossi, for appellee administrator. E. Howard McCaleb,. for appellee dative tutor.

### Statement of the Case.

MONROE, J. This is an action brought by the mother and two brothers, as heirs, of Christian Redenbach, deceased, against the succession of his deceased wife. The· facts, as disclosed by the record, are as follows:

Maria Labat married Henry Belbez, who· died in 1879, leaving one son, Lambert, issue· of the marriage. Thereafter (probably in 1882) the widow married Vito Lamia, who· at that time had one son, Vincent, child of a former marriage. Vito Lamia died ·in 1895, leaving three minor children, Bernada, John,.

and Adele, issue of his marriage with Maria Labat, and one child en ventre de sa mere, who was subsequently born, and named Vita. In 1898, the widow married Christian Redenbach, and she died in November, 1899, leaving one child, issue of her marriage with him. This child died a few months later, and thereafter, in September, 1901, Redenbach died, leaving as his heirs his mother and two brothers, who are the plaintiffs in this proceeding.

In 1891, Maria Labat, then wife of Vito Lamia, received from the succession of her mother the sum of $2,500, which she appears to have turned over to her husband. In December of the same year Vito Lamia acquired, as legatee of his brother, Peter, an undivided one half interest in a barroom known as the "Lugger Exchange," and in the stock of liquors therein contained, as also the stock contained in a certain warehouse No. 348 Chartres street; and the other half interest in said property was acquired by Emile Bonnafon, who, in April, 1892, sold the same to his co-legatee, Lamia, for $1,400. Redenbach, who had, originally, been employed in this barroom to wash glasses, etc., at $12 or $15 per month, was then employed by Vito Lamia as barkeeper at $35 or $40 a month, and continued to be so employed by Mrs. Lamia after the death of her husband. In July, 1898, when he and Mrs. Lamia were married, he was 24 and she 37 years of age, and it does not appear that he had accumulated any money. Upon the other hand, the assets of the succession of Vito Lamia, exclusive of the lease and good will of the Lugger Exchange, had been appraised at $2,453.05, of which $131.50 were said to belong to his separate estate and $2,321.55 to the community; and those assets, as also the lease and good will of the Lugger Exchange, had been turned over to the widow, who asserted a claim against the succession, predicated upon an authentic act executed before Doriocourt, notary, of date January 30, 1892, for the $2,500 which she had turned over to her deceased husband. Of the assets mentioned, $1,638.80 consisted of cash in bank, which was transferred to the credit of "Widow Vito Lamia." The Lugger Exchange was held under a lease from the city of New Orleans, which had been extended for a term of 10 years beginning July 1,

1892; and, after the death of Vito Lamia, as before, the business was fairly profitable. The widow does not, however, appear to have continued her bank account, but kept her money at home in a tin box, both before and after she married Redenbach, who, after as before the marriage, was employed by her to assist in the management of the business, and it is shown that she so kept it at the time of her death. After that event, her surviving husband, without opening her succession, assumed control of her estate, and continued to carry on the business of the Lugger Exchange, and he at one time spoke of having the lease from the city made in his name, but died before that was accomplished. In the meanwhile two of the Lamia children, Adele and Vita, were taken care of for several months by Mrs. Sporl, a cousin of their mother, and then sent to a convent. The other girl, Bernarda, was married to Victor Miorana, and the boy, John, appears to have taken care of himself.

In September, 1901—nearly two years after the death of Mrs. Redenbach, and shortly after the death of her last-mentioned husband—her succession was opened, upon the application of her stepfather, Felix Fageret, who presented a petition praying that an inventory be taken, and that a family meeting be convened to advise with reference to the appointment of a tutor and undertutor for the minors, and thereafter Lambert Belbez, the son of the first marriage, applied for letters of administration, and Vincent Lamia was appointed dative tutor to the minors. Belbez was appointed administrator, and the inventory was taken as prayed for, the total valuation of property described as belonging to the community which had existed between the deceased and Vito Lamia and as the separate estate of Vito Lamia amounting to $2,978.05. Included in this inventory were two tin boxes—the one marked "Vito Lamia," produced by Adam Redenbach (brother of Christian, and plaintiff herein), who was employed in the barroom when Christian Redenbach died; the other, found in an armoir at the residence on Elysian Fields street, which had been occupied by Maria Labat during her last two marriages, and at which both husbands had died. The box first mentioned contained three policies of insurance on the lives of the minors John,

Adele, and Vita Lamia; a policy of fire insurance, in the name of Christian Redenbach, on the furniture in the residence mentioned above; a lot of jewelry—breastpins, earrings, etc.; a few odd coins, valued at $11.95; an old pocketbook; a bank deposit book in the name of Vito Lamia, showing that on February 11, 1896, there was a balance to his credit in the People's Bank of $1,638.80; and a lot of papers—receipts for taxes, etc., and acts showing Lamia's title to the Lugger Exchange. The other box contained $3.20 in cash; a lot of jewelry; a bank deposit book in the name of Widow Vito Lamia, showing that on February 20, 1896, there was a balance to her credit in the People's Bank of $1,638.80; and a copy of the lease from the city to Peter Lamia of the Lugger Exchange. There was also included in the inventory the furniture in the residence on Elysian Fields street; the lease and stock of the Lugger Exchange and some other articles found at either one place or the other; the sum of $2,004.90, found in the Germania National Bank to the credit of "Christian Redenbach, Agent"; and the sum of $113, found and left in the hands of Adam Redenbach, being, as he stated, receipts from the bar up to September 26, 1901.

This inventory was filed in court October 23, 1901, and on the following day Mrs. Caroline Traut, the mother, and Adam and Charles Henry, the brothers, of Christian Redenbach, filed an opposition thereto, in which they say: "(1) That the said inventory credits the succession of Maria Labat with the sum of $2,004, which said sum is entirely and exclusively the property of your opponents by reason of the death of their son and brother, who acquired said sum long after the death of his wife and after the dissolution of the community existing between them; that said money is deposited as 'C. Redenbach, Agent'; and that said agency was started eight months subsequent to the death of his wife, and came from no part of her estate. (2) That at no time does the inventory disclose the interest of C. Redenbach in any of the property and effects inventoried, although in absolute ownership and possession thereof up to the time of his death. (3) That in the proces verbal the succession of Vito Lamia has been brought in to mislead and to mystify the

court, a quasi act of partition has been made and incorporated therein."

They therefore pray that the inventory be set aside. This was followed or accompanied by a petition in a direct action, in which the petitioners, as heirs of Christian Redenbach, reassert their claim to the deposit in the Germania National Bank, and further allege: "That the said notary also included in said inventory the whole of the contents of the Lugger Exchange No. 1, kitchen, other rooms, contents of bank box, cash in hand of Adam Redenbach, as also all the furniture and contents of premises No. 614 Elysian Fields street, from which said C. Redenbach was buried, enumerated in detail, on page 4 to the conclusion of the inventory, as being the exclusive property of said estate of Mrs. Maria Redenbach, whereas in truth and in fact one-half belonged to Christian Redenbach, to which your petitioners are entitled," etc.

And they pray that the notary, the administrator, and the tutor of the minors be cited, and that there be judgment annulling the inventory and decreeing them to be the owners of the money in bank and of one-half of the other property described. To this petition the notary filed an exception of no cause of action, and the administrator, on the same ground, excepted to that portion of the plaintiffs' demand which prays for the annulling and rescinding of the inventory and of the proceeding in connection therewith. He then proceeds by the same pleadings to say: "And in case the said exception is overruled, and not otherwise, and reserving all the benefits thereof, defendant, Lambert Belbez, denies all and singular the allegations of plaintiffs' petition. Further answering, defendant alleges that all the property of the succession of the deceased, Mrs. Maria Labat, widow of Vito Lamia, and wife of Christian Redenbach, consists: (1) Of jewelry and furniture, etc., located in the house No. 613 Elysian Fields street; (2) contents of barroom, lease thereof until July, 1902, etc., known as the 'Lugger Exchange,' situated on the levee of the Mississippi river, at the foot of Ursulines street; (3) two thousand and four $^{90}/_{100}$ dollars in the Germania National Bank in the name of Christian Redenbach, Agent."

He then alleges that the property first de-

scribed belonged to the community which existed between Maria Labat and Vito Lamia; that the property secondly described belonged one half to said community and the other half to the separate estate of said Vito Lamia; and that the money thirdly described belonged either to said community or to the separate estate of Maria Labat, widow of said Lamia. He further alleges that Christian Redenbach simply administered said property during the life of his wife, and that he continued to do so after her death. The answer then proceeds: "And, in the event that the court should hold that the property is not the property of the said Maria Labat, * * * defendant asks for a judgment in his favor, as administrator, * * * for such sum as the evidence will show as the value of the separate property of the deceased, administered by her said husband, Christian Redenbach," etc.

The defendant then finally prays that the plaintiffs' demands be rejected in toto. The exceptions of no cause of action filed on behalf of the notary and the administrator were maintained (quoting) "in so far as the inventory is concerned," and the notary appears to have considered himself eliminated. As between the plaintiffs and the administrator, however, no tutor having been appointed, the case proceeded.

The plaintiffs allege in their pleadings that the money in the bank belonged to Christian Redenbach. Being confronted upon the trial with the fact that by depositing it to his credit as agent he had admitted that he held it for some one else, they attempted to prove that upon Sunday, July 10, 1900, one of them (the mother) had given him $800 for safe-keeping, the idea apparently being that the court should deduce therefrom that the $800 so given formed part of a sum of $1,070 deposited by him as agent July 13, 1900, or of other amounts so deposited subsequently. This attempt has no other support than the improbable testimony of the two plaintiffs the mother and brother of Christian Redenbach. They testify that the mother made her living by scrubbing in barrooms about three days in the week, whereby she earned $2 a day; that to her earnings were added those of her son Adam, coplaintiff and corroborating witness, who also worked in barrooms as a washer of glasses at $15 and as barkeeper at $35 or $40 a month, and who, although he had attained the age of 23 years by the time the money was accumulated, had, it is said, turned over to his mother every cent that he had made, reserving absolutely nothing to himself. It is further said by these witnesses, or at least by the mother, that from the income thus derived she had supported herself and paid her rent, had clothed herself and her son Adam, and 12 years before had accumulated the $800 in question, which she thereafter carried about on her person until she gave it, for safe-keeping, to her son Christian; both witnesses being particular to say that this latter transaction took place on Sunday, July 10, 1900.

It so happens that July 10, 1900, fell upon Tuesday. Beyond this, however, we are not told how it happens that the plaintiff, Mrs. Traut, received $2 for scrubbing, when the usual wages for work of that kind are shown to be 75 cents, or why, having saved $800 as far back as 1888, she carried that exact amount about on her person for the 12 years following, and neither added or subtracted anything to or from it, or why she then concluded to turn it over to her son Christian, who had not assisted her, rather than to her son Adam, who had always assisted her, and who was much older than Christian; or why she failed to take written evidence of the alleged deposit, and failed, during the 17 days that Christian was confined with the illness of which he died, to inquire about it, or why it was not mentioned in her pleading, but was brought to the attention of the court only in her testimony, and as an afterthought to meet the objection to her allegation that the money on deposit to the credit of Christian Redenbach belonged to him, that he, by his own act, had admitted that he held it for some one else.

Upon the other hand, the evidence shows conclusively that Christian Redenbach, a barkeeper, 24 years old, who had accumulated nothing, married a woman 13 years older than himself, twice a widow, with five children and a stepson, who had a home of her own and an established money-making business, which she had employed him, at a small salary, to assist her in conducting; that dur-

ing the marriage, which lasted little more than a year, he continued to so assist her, and that after her death, without legal authority, and without taking the steps required by law for the protection of her children, he still continued to conduct that business, and to hold in his possession everything else that had belonged to his deceased wife, or of which she had had control.

He did not, however, pretend that either the business or the property in question belonged to him, and we entertain no doubt that, in representing himself as agent for the purposes of the deposit in the Germania National Bank, he meant that he was acting as the agent of the lawful owners, the heirs of his deceased wife.

The learned judge of the district court reached the conclusion—in which we concur—that beyond a half ownership in a certain set of parlor furniture, acquired during the existence of the community between him and his wife, Christian Redenbach had no interest in the property described in the inventory which is here attacked, save such as he had inherited from his infant child, issue of his marriage, which had survived its mother, and had thus inherited a portion of her estate. He (the judge) therefore rendered judgment "in favor of the plaintiffs * * * recognizing them, as the heirs of Christian Redenbach, to be the owners of $11/20$ of the parlor set, * * * of $3/100$ of the other effects of the defendant succession, of $2/100$ of the property known as the 'Lugger Exchange,' and of $2/100$ of the money in bank in the name of Christian Redenbach, agent"; the plaintiffs' demands in all other respects being rejected. From the judgment thus rendered the plaintiffs have appealed, and the administrator has answered the appeal, alleging that the judgment proceeds upon the theory that Maria Labat, widow and wife, left surviving her but five children, whereas in point of fact she left six, and that it should be amended accordingly, and otherwise affirmed.

The error suggested is patent upon the face of the record, and results, no doubt, from inadvertence. In this court also appears Vincent Lamia, dative tutor of the minors John, Adele, and Vita (appointed since the trial in the lower court), and, apparently overlooking the error above mentioned, asks that the judgment appealed from be affirmed.

### Opinion.

Considering the questions which have been raised, the present attitude of the parties litigant, and the foregoing statement and findings of fact, our conclusions as to the legal rights of the parties are as follows: Christian Redenbach, as partner in community, owned an undivided one-half interest in the parlor set, the other one-half interest being owned by the six children of his deceased wife in the proportion of $1/12$ each. When the child, issue of his marriage, died, he inherited from it $1/4$ of $1/12$, or $1/48$, which, added to his $1/2$, or $24/48$, gave him $25/48$, to which proportion his heirs are therefore entitled.

The Lugger Exchange, and whatever pertained to it, including the business there conducted and the money in bank, belonged, in equal proportions, to Vito Lamia and the community which existed between him and his wife. When he died, his five children inherited $1/2$ plus $1/4$, or $3/4$, of that property. It seems to be conceded that Vincent Lamia (Vito Lamia's son by his first marriage) sold his interest in his father's succession to his stepmother, so that she owned $1/4$ plus $3/20$, or $2/5$, which was inherited by her six children in the proportions of $1/15$ each. And Redenbach, as the father of one of those children, inherited at its death $1/4$ of $1/15$ or $1/60$, to which the plaintiffs, as his heirs, are entitled.

The other property included in the inventory belonged to the community between Vito Lamia and his wife, and the latter owned $1/2$, or $5/10$, plus $1/10$ acquired from Vincent Lamia, making $6/10$, which was inherited by her six children in the proportions of $1/10$ each. Redenbach inherited from the child of which he was the father $1/4$ of $1/10$, or $1/40$, which the plaintiffs, as his heirs, are entitled to recover.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended in so far as to recognize the plaintiffs as entitled to $25/48$ interest in the parlor set as described in the inventory, to $1/60$ interest in the Lugger Exchange and whatever pertains thereto, including the business there conducted and the money in bank, and to

$1/40$ interest in the other property included in the inventory.

It is further ordered that, as amended, said judgment be affirmed, the costs of the appeal to be paid by the plaintiffs.